UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 16 CR 462-7 |
| v. ) | |
| ) | Hon. Rebecca R. Pallmeyer |
| RUBEN MORENO, a/k/a "Terrorist" ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

"Since I got rank now talkin' about I can't be doin' the shit I be doin' but I can't stop it. It's just me . . . especially when you get away with it, you just wanna keep goin.'" *See* GV Ex. 18, 19 (1D-71 clip and transcript).[1] For over six years, the defendant was not simply a member of the Maywood Latin Kings, a violent and destructive enterprise responsible for incalculable misery and fear, he *enjoyed* it. As he told a cooperator during a consensual recording, despite his rank as the second-in-command for the gang's younger circle, he could not stop getting his hands dirty. Nor can this defendant say that he left the gang and instead pursued a different path. Following the indictment in this case, the defendant fled to Michigan where he was eventually arrested. Even while in custody, the defendant has conspired with a co-defendant to throw feces at another inmate in an attempt to relocate to a different cell. As such, the Court is confronted with a violent offender whose particular need for deterrence is high. Accordingly, for the reasons set forth below, the government respectfully requests that the Court impose a sentence within the defendant's guideline range.

---

[1]     Exhibits to the Government's Version of the Offense are cited as "GV Ex."

## I. Objections and Clarifications to the PSR

### A. Paragraph 20

Paragraph 20 of the PSR should be clarified to the extent it currently states, "the defendant collected the cellular phone of CS-1." Rather, as indicated in the Government's Version, the defendant collected cellular phones from CS-1 (including that of one of the shooters, Edgar Velarde-Saldana a/k/a "Chapo").

### B. Paragraphs 69 and 71

Although it does not impact the defendant's overall guideline calculations, the government objects to Paragraphs 69 and 71 of the PSR. On July 12, 2014, the defendant and other co-conspirators planned and committed the arson of a rival Imperial Gangster's truck. *See* PSR ¶ 31; Government's Version at 7. The Latin Kings employ a very hierarchical structure. *Id.* at ¶ 12. At the time of the incident, the defendant was the "Cacique" or second-in-command of the younger circle of the Maywood Latin Kings and, as such, held a supervisory or managerial role in the gang. *See e.g., id.* at ¶¶ 17-20, 23, 29. Additionally, two cooperating sources provided sworn grand jury testimony as to the defendant's oversight of the arson. *See* Government's Version at 7; GV Ex. 1 at 53; GV Ex. 2 at 31-32.

As part of its offense level calculation, despite finding that the defendant "held a leadership role" and the offense involved at least five or more participants, the PSR concluded that, "in relation to the [July 12, 2014] arson, the defendant conducted participated [sic] by conducting surveillance. Therefore, there is no indication that the defendant played a leadership role in this arson or supervised the other

2

participants in the arson, and a role enhancement is not warranted." *See* PSR ¶ 69. Contrary to the PSR's conclusion, there is evidence that the defendant directed the execution of the arson. In particular, CS-1 testified that, "[w]hen we got there, [the defendant] and [LK D] were already there in a separate vehicle. They were driving around to make sure that no IGs [Imperial Gangsters] were out in the neighborhood . . . <u>After Bowser [the Enforcer] spoke briefly with [the defendant (who was the Cacique and outranked Bowser)], Bowser told me to park in a nearby alley</u>." GV Ex. 1 at 53 (emphasis added). Moreover, CS-3 testified that the defendant, among others, was present on the scene to "make sure we were successful." GV Ex. 2 at 31-32. The defendant was present to conduct counter-surveillance for rival gang members, but he was also there to make sure that it occurred, to direct how it should occur, and to make sure that it was successful. The defendant's presence (as the Cacique) at the very least ensured that non-ranking members would follow through with the ordered arson (failure to commit the arson or fabricating an excuse would have resulted, at a minimum, in a beating violation). As such, the defendant should receive a three-level role enhancement under Guideline § 3B1.1 and his adjusted offense level for the July 12, 2014, arson should be 23 (instead of 20).

**II.    Guidelines Calculation**

The government agrees with the PSR's calculation of a total offense level of 35,[2] which, when combined with the anticipated criminal history category of II,

---

[2]    As noted on pages 16-17 of the Government's Version, the government reserves the right to take the position that the defendant has not accepted responsibility pursuant to Guideline § 3E1.1 based upon the fact that the defendant was a fugitive and if he, "falsely denies, or frivolously contests, relevant conduct that the court determines to be true." *See* §

3

results in an anticipated guideline range of 188 to 235 months' imprisonment. *See* PSR ¶ 154.

III.    **Sentencing Recommendation**

    A.    **A Guideline Sentence Is Sufficient, But Not Greater Than Necessary**

In his leadership role, the defendant oversaw, guided, participated in, and ordered his co-conspirators to participate in unlawful activities in furtherance of the conduct of the Latin Kings, including multiple acts involving murder, arson, and extortion. Through his participation in the Latin Kings, the defendant directly contributed to the violence that permeates the streets of Chicago and caused devastating harm to countless individuals. The sentence imposed must reflect both the gravity of the defendant's conduct and the magnitude of harm he caused. Finally, the sentence imposed must provide just punishment and adequate deterrence (both specific and general). A sentence within the defendant's guideline range is sufficient,

---

3E1.1, n. 1(A); *United States v. Bailey*, 97 F.3d 982, 986 (7th Cir. 1996) (affirming denial of acceptance for defendant who pleaded guilty) (internal citations omitted). Upon arrest, the defendant admitted that he cut his hair because he knew law enforcement was looking for him. *See* GV Ex. 29. Pursuant to application note 5(D) to Guideline § 3C1.1, "avoiding or fleeing from arrest" does not ordinarily warrant application of an enhancement for obstruction of justice "but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply (e.g., § 3E1.1 (Acceptance of Responsibility))." The defendant also pled guilty pursuant to a plea declaration. The government recognizes that, while the defendant's plea declaration said nothing about the violence he and his co-defendants were responsible for and admitted just enough to satisfy the requirements of Federal Rule of Criminal Procedure 11, the defendant is not required to affirmatively admit or volunteer relevant conduct in order to receive a reduction for acceptance of responsibility. At sentencing, however, these additional racketeering acts will be discussed in detail, so the government wishes to preserve the right to ask the Court, consistent with the law in this Circuit, to deny a reduction for acceptance of responsibility should the defendant deny or minimize his role in the offense.

but not greater than necessary, to comply with the principles set forth in 18 U.S.C. § 3553(a).

### 1. The Nature and Circumstances of the Offense Warrant a Guidelines Sentence[3]

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider "the nature and circumstances of the offense." That said, it is impossible to overstate the serious nature and circumstances of the defendant's offense.

#### a. Latin Kings

The Latin Kings are a highly organized and hierarchical criminal enteprise, with its own constitution, manifesto, and code of conduct, as well as its own colors, handshake, salute, emblems, signs, flag, and territories. Territories were divided into "regions," which were further divided into "sections" (sometimes called "chapters"). The highest-ranking member of a section is the "Inca," and the second highest-ranking member is the "Cacique." Below the "Cacique" is the "Chief Enforcer" and the "Enforcer."

There were several regions of the Latin Kings operating in Chicago and the suburbs of Chicago. One such region was the "Midwest" region. Included within the Midwest region was the Maywood section of the Latin Kings, which the defendant joined sometime in 2010. PSR ¶ 17. Beginning no later than approximately March 2014, the defendant held the Cacique position for the younger circle of gang members. *Id.* As Cacique, the defendant supervised non-ranking and lower-ranking members

---

[3] The Government's Version contains additional facts regarding the nature and circumstances of the offense.

5

to commit racketeering acts. Because of his rank, the defendant also attended meetings with members of the older circle. *Id.*

### b. Rules and Practices

The Latin Kings had a rigid set of rules and practices, which were contained in the gang's written "manifesto" or "constitution" as well as the Maywood section's local rules. GV Ex. 7. In his role as Cacique, the defendant ensured adherence to these established rules and practices and enforced discipline for disobedience.

### c. Security and Firearms

One of the gang's most important rules required members to protect themselves, other Latin King members, and the gang's territory from its rivals, often through violence. One of the ways the Latin Kings protected their territory was by conducting mandatory "security," which was sometimes referred to as "posting-up." That meant that members patrolled their territory, armed with guns, and were required to shoot to kill any trespassing member of a rival gang, any former member of the Latin Kings not in good standing, and any other individual that posed a threat. Members were required to carry guns when they patrolled in their own territory and also when they traveled to rival territory.

As a Maywood Latin King, the defendant embraced the violence that came with conducting "security" and having constant access to firearms. As noted in Paragraphs 23-28 of the PSR and pages 5-6 of the Government's Version, the defendant personally held firearms while on security and, as Cacique, provided firearms and ammunition to other co-conspirators to conduct security (along with instructions on where to patrol). As noted in Paragraph 27 of the PSR, on one occasion, after another gang

member failed to shoot at suspected rival gang members entering their territory, the defendant complained, disappointed, that "we could have merked [killed] 'em." *See* Government's Version at 6; GV Ex. 15 and 16. On another occasions, the defendant pointed a .38 caliber revolver at a suspected rival gang member's head in the parking lot of a liquor store in Maywood Latin King territory. *See* PSR at ¶ 24; Government's Version at 5-6. Because another Latin King (who outranked the defendant) instructed him not to shoot, the defendant did not shoot that person in the head.

### d. Shoot on Sight Orders and Violations

Another method the gang used to protect themselves and their power was issuing standing orders to shoot (also known as "SOS" orders) and beat rival gang members and former Latin King members, also known as "runaways," and by ordering "burns," "hits," and "missions," which were one-time orders to shoot and beat specific rival gang members and runaways. The gang's rules also required violence against fellow Latin King members. For example, new recruits were initiated into membership through violent beatings. In addition, the rules provided for mandatory beatings or "violations" for any member who broke the rules or failed to follow orders. The message was clear: disobedience would not be tolerated. What these rules and practices make clear is that violence, shootings, and death were a day-to-day part of the Latin King lifestyle. A lifestyle that members were expected to embrace and adhere to. See GV Ex. 7 "Membership" ("Membership shall be available to anyone who is willing to change their lifestyle for the doctrine of Kingism.").

7

### e. As a Maywood Latin King, the Defendant Conspired to Murder Rival Gang Members, as Well as Committed Arson and Extortion

As a Maywood Latin King, the defendant further agreed to specific plans to commit shootings and discussed prior shootings that he personally committed. As detailed in Paragraphs 32-34 of the PSR, between July 5 and 6, 2014, the defendant and others conspired to carry out several "hits" or shootings at rival gang members. On July 5, 2014, the defendant and multiple co-conspirators planned to commit a shooting at a particular house associated with members of the IGs.[4] *See* GV Ex. 1 at 31-34. During the meeting on July 5, 2014, which was consensually recorded by CS-1, the defendant's co-defendant Medina (a/k/a "Bowser") (who was the Enforcer of the younger circle at the time) directed how the shooting would occur:

| | |
|---|---|
| BOWSER: | Alright well look the Gangsters [Imperial Gangsters] are right there on seventeen [17th Street] and Main [Street]. Like I said, the first part we're gonna go and do it on St. Charles nigga [there are train tracks that cross St. Charles Street to get to Main Street]. |
| CS-1: | Okay. |
| BOWSER: | [Spanish] You're gonna be parked right there in the alley. You and me will get out [CS-1 and Bowser will get out of the car]. Well, I'll get out to see. [LK G] is going to go light the Gangsters up [shoot the IGs]. This guy . . . this guy [LK G], when he does that we're gonna run to your car and we're gonna hit St. Charles all the way over here [to Main Street]. |
| CS-1: | I gotta work tomorrow. |
| BOWSER: | But, I wanna, that's why I wanna do it fast nigga [do the shooting fast] . . . |

***

---

[4] The gang would commit the arson of the IG's vehicle at this location approximately one week later. *See* PSR at ¶ 31.

8

| | |
|---|---|
| BOWSER: | Fuck it man I'm, I'm gonna go nigga. I'm gonna wait for his [LK G's] ass. He's gonna go shoot a nigga and I'm gonna come, bring the truck back right here quick action. I'm gonna go with him in the truck . . . I'm waiting on Monster just to bring that [gun] as soon as he gets here, I'm gone. |
| TERRORIST: | I'm not supposed to be doin' none of that. |
| BOWSER: | Alright (UI). |

***

| | |
|---|---|
| BOWSER: | No I'm with ya. Ah, if you drive I'll drive it don't matter King. I'm waiting on Monster just bring that [the gun] as soon as he gets here I'm gone. |
| CS-1: | Oh he's gonna bring the thumper [gun]. |
| BOWSER: | Yeah. Oh where's that shit at? You got it? [the gun] |

***

| | |
|---|---|
| CHAPO: | If we're gonna go, we're gonna go right now [go shoot at IGs] . . . |
| DRE: | That's what I'm sayin' nigga. Call Monster. |
| BOWSER: | That's what I'm sayin' nigga. Lemme call Monster . . . Lemme call Monster King tell em if he's comin already cause his brother [King] gots to go to the movies. |

*See* GV Ex. 21 (1D-101 at approximately 4:23 to 8:10); GV Ex. 22 at 2-5. As they planned the shooting, the defendant and others discussed the gun available for the shooting and how it only had six shells, but agreed to do the shooting anyways:

| | |
|---|---|
| TERRORIST: | (UI) we can't get the shells.. |
| UM: | We can't get shells? |
| TERRORIST: | No we only got (UI). |
| BOWSER: | Well, we'll just do it with the 6. Fuck it. |

*See* GV Ex. 21 (1D-101 at approximately 9:00 to approximately 9:15); GV Ex. 22 at 6. The defendant and other gang members then saw police in the area and decided to re-schedule the shooting for the next day:

| | |
|---|---|
| TERRORIST: | Look there goes Melrose [Melrose Park Police Department]. |

9

| | |
|---|---|
| BOWSER: | Oohh… |
| TERRORIST: | (UI) dude there on it dude they keep coming back and forth. |
| TERRORIST: | That's the second time already [Melrose Park police passed by twice]. |

***

| | |
|---|---|
| TERRORIST: | (UI) tomorrow everybody better be ready. No excuses for nobody. |

***

| | |
|---|---|
| BOWSER: | So it's on you King your call (UI). |
| TERRORIST: | Yeah we'll do it [the shooting] tomorrow. |
| BOWSER: | Do it tomorrow. |
| CS-1: | Tomorrow. |
| TERRORIST: | What time is it right now? |
| BOWSER: | (UI) 10 o'clock. |
| TERRORIST: | We're gonna do it [the shooting] around this time. |
| BOWSER: | This time? |
| CS-1: | Tomorrow. |
| BOWSER: | Tomorrow? |
| UM: | Tomorrow (UI). |
| BOWSER: | All of it right here King you gonna come do it tomorrow nigga (UI)…everybody. |
| TERRORST: | (UI) there's gonna be no excuses. |

***

| | |
|---|---|
| TERRORIST: | Yeah but, but whoever's not here at 10, not even, no matter if you're 5 minutes late you guys are gonna get hit up [any members who were late would be beaten or "violated"]. |

***

| | |
|---|---|
| TERRORIST: | Yeah, everybody's (UI) be here by 10. |

*See* GV Ex. 21 (1D-101 at approximately 9:35 to 15:50); GV Ex. 22 at 7-13; GV Ex. 1 at 34. After the defendant decided to re-schedule the shooting, during a consensually

recorded conversation with CS-1, he told CS-1 about a prior occasion where he shot at the IGs at the same location:

| | |
|---|---|
| CS-1: | So these niggas [IGs] are on fifteenth and Main? |
| TERRORIST: | Seventeenth. |
| CHS: | Seventeenth. Isn't the police station right there? |
| TERRORIST: | Yep, right near or next door. It's crazy . . . we go around the other side. We go around the [train] tracks [to shoot at the IGs]. Cause it's the other side we go on Maywood side . . . and we park by the police station or we can park in the alley and walk over the train tracks and you're right there. That's the best way to do it . . . that's how I did it [a shooting] and busted my shit. |
| CHS: | You fell? |
| TERRORIST: | Yeah [laughing]. Fuckin', I tripped on the track or something, some big ass rocks over there . . . dude, I was cracking up on my way back . . . made me stop being nervous . . . in the car after we got away, I told the brothers I just busted my shit nasty and dropped the banger [gun] and everything. |

*See* GV Ex. 21 (1D-101 at approximately 28:02 to approximately 29:05); GV Ex. 22 at 20-21; GV Ex. 1 at 35.

The next day, the defendant met with Perez (Inca) and Ortiz (Chief Enforcer) to discuss planned shootings prior to a meeting of the younger circle. *See* GV Ex. 23 at 1-2. During the meeting, they agreed that the gang would carry out three separate shootings that night. *Id.*; GV Ex. 1 at 36-37. Later that same night, during the gang meeting, the order was given to do the three shootings. *See* PSR at ¶¶ 32-34. Following the meeting, the defendant left with David Perez a/k/a Monster to obtain a firearm for use in one of the shootings. *Id.* As a Maywood Latin King, the defendant embraced the murder of rival and runaway gang members. *See* PSR at ¶¶ 32-37.

11

The Maywood Latin Kings were also engaged in arson. As noted above, on July 12, 2014, the defendant and other Maywood Latin Kings set a rival gang member's truck on fire. The defendant, because he held rank, participated by surveilling the area and ensuring that the other gang members carried it out. As detailed in the Government's Version, the gang members came prepared with firearms and posted lookouts to ensure that if they were interrupted, they could respond to any threats. Setting another person's truck on fire in a residential community, while others standby with firearms pointed at the house and others remain nearby on alert for rival gang members who might interrupt, is exceedingly dangerous. It obviously presents risk to those who might otherwise be going about their business, as well as those who might be caught in the cross-fire should the arson have been interrupted. The defendants' actions placed the community at risk.

The defendant and other Latin Kings also engaged in acts of extortion, including by collecting "street tax" from non-gang members who distributed controlled substances, including cocaine, within the geographical location controlled by the enterprise, as well as local businesses. *See* Dkt. 413 at 2; PSR at ¶¶ 38-39;

### 2. Defendant's History and Characteristics

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must also consider "the history and characteristics of the defendant." While the defendant entered a timely guilty plea and the PSR reflects a reported history of domestic violence, the rest of his history and characteristics heavily favor a sentence within the guideline range.

*First*, the extended duration of the defendant's participation and membership in the Maywood Latin Kings demonstrates the need for a guideline sentence. The

defendant was a member of the gang for at least approximately six years (2010 through 2016). *See* PSR at ¶ 17. Over the course of those six years, the defendant certainly had opportunity to disassociate himself from the gang but did not. The defendant's abundant gang tattoos including the crown, the tear drops, and the letter "M" [Maywood] tattooed on his face further demonstrate his lifelong commitment to the gang.

*Second*, unlike several of his co-defendants, the defendant held a leadership position within the gang. The defendant's history as Cacique must be taken into account when evaluating the pain, influence, and suffering brought about by the defendant himself and those below him. Nor is the defendant's rank devoid of significance. As expressed during several consensual recordings, the defendant was often tasked as the decision-maker when it came to executing shootings or other matters (especially when the younger circle's Inca, David Perez a/k/a "Monster" was unavailable). *See* PSR at ¶¶ 19-20; Government's Version at 4, 8-10.

*Finally*, and perhaps most disturbingly, the defendant committed the instant offense not out of desperation, greed, a momentary lapse in judgment, mental illness, addiction, or any other such reason. Rather, the defendant enjoyed his participation in the Latin Kings and the violence it brought. As noted above, the defendant himself said (when he thought no one was recording), "I can't stop it. It's just me." *See* PSR at ¶ 26; GV Ex. 18-19. The defendant's own words are corroborated through his actions. He used Facebook to post a video recording of himself and other gang members flashing gang signs, displaying handguns, and taunting rival gang

13

members while in rival gang territory. *See* PSR at ¶ 21; GV Ex. 8; Government's Version at 4. The use of social media by gang members to taunt and intimidate their rivals is currently fueling rampant and senseless violence in the community. It is not hard to imagine a rival gang member's response, or how the defendant and his co-conspirators would have reacted if, while filming that video, they came across a rival gang member (or as is often the case, mistakenly targeted a bystander). The defendant's overwhelming enthusiasm for the Latin Kings extends to his use of Facebook to post messages of himself and others Latin Kings flashing gang signs and expressing their support for co-defendant Ellezer Torres, a/k/a "Bad Boy" after Torres was arrested in connection with the December 2015 murder of a "runaway" former Latin King member and attempted murder of several witnesses to that murder. *See* PSR at ¶ 22; Government's Version at 4-5; GV Ex. 9 and 10. In addition to expressing support, the defendant used the forum to taunt others and announce his joy at the runaway's murder, "Slick [deceased victim] ROTZ [rots] we at yall hang out bitchez don't hide come out and play where ya at?" and "Slick [deceased victim] Rotz [rots] we om [sic] it MLK [Maywood Latin Kings]."

A sentence within the defendant's guideline range takes into account the defendant's history and characteristics, including the defendant's leadership role and prolonged, enthusiastic, and wholehearted embrace of the Latin Kings and all of its violence and destruction.

### 3. A Guidelines Sentence is Appropriate Upon Consideration of Section 3553(a)(2)

Pursuant to 18 U.S.C. § 3553(a)(2), the Court must consider the need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

A sentence within the defendant's guidelines range adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. Among the offenses brought before the Court, the defendant's is among the most serious, especially in this community. There is a significant need for the sentence imposed to promote respect for the law and provide just punishment for this defendant who has otherwise kept "get[ting] away with it."

Similarly, there is a heavy need for the sentence imposed to afford adequate deterrence and to protect the public from future crimes of the defendant. The defendant's prolonged membership in the gang was not a one-time lapse in judgment. This is not a defendant where the removal of a condition or trigger, an addiction or stressor, will deter him from committing future crimes. Even while in custody, Kankakee County correctional officers have sanctioned the defendant after he, in

concert with Torres, intentionally flooded his cell and threw feces and urine at another inmate. *See* July 26, 2018, Supplemental Report to the PSR.[5]

Moreover, in a community absolutely shaken by senseless gun violence, particularly that involving individuals using social media to incite violence and instill fear (like this defendant), there must be consequences. While the criminal justice system can only address so many of the ills that cause the violence plaguing this community, it plays an important role when those responsible for perpetrating the destruction stand before the Court. Many innocent members of society live in constant fear. They do not let their children play outside, they do not go out after dark. They usher their children along what they can only pray are "safe passages" to school. There must be a deterrent message sent to those, like this defendant, who contribute to this environment of fear. This defendant wants to "keep goin,'" because like many others, all he sees are other gang members "get away with it." A guideline sentence would adequately takes into account these considerations of deterrence, promoting respect for the law, and providing just punishment.

### B. Supervised Release

The government recommends a sentence that includes a term of three years' supervised release that includes the terms and conditions recommended in the PSR.[6]

---

[5] In Paragraph 121 of the PSR, the defendant suggested to Probation that he "left the gang because of this case." The defendant's conduct while in custody demonstrates this could not be further from the truth.

[6] Pursuant to Paragraph 152, it appears as though the defendant does not have the ability to pay a fine and therefore the government does not request that one be imposed. Similarly, as noted in the PSR, restitution and forfeiture are not at issue with regard to this defendant.

**IV. Conclusion**

For the reasons set forth above, the government respectfully requests that the defendant receive a sentence within his guideline range.

                Respectfully submitted,

                JOHN R. LAUSCH, JR.
                United States Attorney

By:   s/ *Matthew Hernandez*
        JENNIE LEVIN
        MATTHEW HERNANDEZ
        Assistant U.S. Attorneys
        219 South Dearborn, Fifth Floor
        Chicago, Illinois 60604
        (312) 353-5300

Dated: August 6, 2018