**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | No. 16 CR 462-7 |
| | ) | Honorable Rebecca R. Pallmeyer, |
| **RUBEN MORENO.** | ) | Chief Judge |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT MORENO'S SENTENCING POSITION PAPER

**NOW COMES** the defendant, **RUBEN MORENO**, by and through his attorney, **ROBERT L. RASCIA**, and, pursuant to Rule 32 of the Federal Rules of Criminal Procedure and United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), respectfully submit his sentencing position paper.

**I.  Guideline Calculation**

The presentence investigation report, page 16, paragraph 95, states that the total offense level is 35. The author of the report included a total reduction of 3 levels pursuant to guideline §3E1.1(a) and (b), for acceptance of responsibility. The defendant entered a plea of guilty to Count I of the indictment through a written plea declaration. Counsel asserts that, through his position at sentencing specifically acknowledging his aggravating role in the offense and the factual basis to establish the aggravating role enhancement, this application of the acceptance of responsibility reduction is appropriate. More specifically, the defendant acknowledges his role as 'Cacique' during a portion of the time that he was a member of the Maywood Latin Kings relevant to Count I. While that time was brief and his ascension to that position was essentially by default, the defendant acknowledges this role.

-1-

The defendant's criminal history category is II, based on a 2011 misdemeanor Criminal Trespass to Land offense (1 criminal history point and an additional 2 points pursuant to guideline §4A1.1(d) because the defendant was serving that supervision sentence when he engaged in the charged conduct). The defendant does not challenge that calculation (page 18, paragraph 106)

The total offense level of 35, combined with a criminal history category of II creates an advisory sentencing range of 188 to 235 months. The statutory maximum sentence is 240 months. The defendant asserts that a sentence below 188 months is appropriate and reasonable, as detailed below.

## II. Nature of the Case

The defendant was charged by an indictment filed July 21, 2016 with a racketeering conspiracy in count I in violation Title 18 U.S.C. §1962(d). The indictment alleged that beginning no later than in or about 2010 and continuing until in or about July 2016 the defendant conspired to conduct and participate in the conduct of the affairs of the Latin Kings street gang through a pattern of racketeering activity which consisted of multiple acts of violence, including murder, arson, and extortion.

The defendant was a member of the Maywood section of the Latin Kings, which was divided into two groups, the 'older' circle was comprised of the long term members of the gang. The defendant was a member of the 'younger' circle. The defendant joined the Latin Kings in 2010, at the age of 17, and he remained a member until his arrest in 2016. The younger circle took orders and direction from the older circle which was led by Pierre Gennell. Each section of the gang, older and younger, had a chain of command with designated individuals filling the leadership roles. Relevant to the defendant in this case, the 'Inca' was the leader of the section. The 'Cacique' was the second-in-command, the Chief-enforcer and the Enforcer served to support the Inca and Cacique. The defendant served as the 'Cacique' of the younger section of

the Maywood Latin Kings for a period of approximately two years. The 'Inca' of the younger section was codefendant David Perez. Pierre Gennell was the 'Inca' of the older section. Miguel Martinez, a 20 year old member of the gang served as Cacique during the period from mid-2014 until July 2016. Martinez was 'Cacique' in 2006, and also during various times acted as Chairman and Chief Enforcer.

  Ulises De La Cruz also served as 'Cacique' of the older section. The defendant was appointed to the 'Cacique' position after another member was incarcerated. The defendant in his role as 'Cacique' took orders from Perez, the 'Inca', and passed those orders to the other section members. The defendant passed along Perez's orders, and also oversaw the activities of the other members in furtherance of Perez's orders.

  As a member of the gang, the defendant participated in gang meetings, paid dues, participated in security details, and followed orders relating to missions involving shootings. The defendant also participated in 'violations' which involved a physical beating of a member that disobeyed an order from the 'Inca' or who desired to leave the gang. The defendant passed along orders, but did not make them.

  The defendant acknowledges that as 'Cacique' he passed along orders from Perez to other members of the gang to conduct security (protect their territory from rival gang members), carry firearms, and shoot at rival gang members while on security, as directed by Perez. Specific instances of acts of violence, shootings, are detailed in the presentence investigation report. On or about August 31, 2014, gang members Carlos Ortiz and Edgar Velarde-Saldana shot at rival gang members and later crashed the vehicle they were riding in as they attempted to flee law enforcement acting at the direction of Perez, the Inca. The defendant collected the cell phones of those involved, and expressed his desire that the shooters make good their escape. The defendant acknowledges his accountability for this conduct, but he notes for sentencing purposes, that he was not a participant in the act of shooting at the victims in this incident. On July 5th and 6th of

2014, the defendant was present at a meeting called by Perez, the Inca, which was attended by multiple members of the younger section. Perez called the meeting to plan the murder of members of a rival gang, the Imperial Gangsters. The shooting mission was postponed by a day, after the defendant alerted others about police presence in the area.

The following day shots were fired by Valdez-Saldana as three other members were being arrested by local law enforcement. The defendant was present at the meeting when Perez planned the shootings, and he went with Perez to retrieve a firearm which was given to another gang member to use in carrying out Perez's plan. For those reasons the defendant acknowledges his accountability for the shooting, but he notes for sentencing purposes, that he was not an active shooter in the incident.

On July 12, 2014 the defendant met with other section members for a meeting with Perez. During this meeting it was ordered that section members torch a vehicle, a Suburban, that was the property of an Imperial Gangster. The defendant acknowledges participating in the meeting, and later acted as a lookout during the incident. Again the defendant acknowledges his responsibility for the offense, by his gang membership, and through his 'Cacique' role at the time of the incident, but again he notes, for the limited sentencing value here, that he did not participate in the setting of the fire. Additionally, he did not plan the event or directly order anyone to carry out the plan.

The defendant also acknowledges his participation in, and knowledge of, activities that are part of the membership in the gang itself, including violations and beatings, collecting and paying dues, collecting street tax from businesses in the gang's geographic territory and narcotics dealers operating in their territory. The defendant did not create this system of violations, beatings, and street taxes, but attached himself to this group when he joined in 2010 until his arrest in 2016. The defendant knew the rules and joined, as did all others involved, along the way he was more essentially an order-follower and not an order-giver.

**III.     Personal History and Characteristics.**

Ruben Moreno joined the Latin Kings at the age of 18. Shortly after his 24th birthday the defendant was charged in this case and has been in jail for his last four birthdays. The defendant is single, the father of a four-year-old boy. The mother of the child, Amanda Jacques, is the longtime girlfriend of the defendant. Ms. Jacques lives in Niles with the defendant's son. The defendant has regular contact with Ms. Jacques and and their son. The defendant also communicates on a regular basis with his mother (Leila), father (Ruben), and sister.

The defendant's path of personal destruction started with his decision to leave his parent's home at the age of 15. The defendant left his parent's home for several reasons but primarily due to constant arguments with his father, Ruben Sr., and the physical abuse that often followed. Ruben Sr. abused alcohol and illegal drugs. Ruben Sr. often criticized the defendant in front of others, commenting on his poor academic performance, his physical appearance, and his poor communication skills. While the relationship between the defendant and his father was never ideal, the arguing, physical fights, and verbal abuse escalated after the defendant received a school conference summary report that Ruben Sr. used to repeatedly berate and criticize the defendant.

The defendant had already left his parent's home, shuffling between staying with relatives first, then friends and periodically back home. The report noted that the defendant had deficits in basic reading skills, reading comprehension, mathematics calculation, memory and perception, which adversely affected his educational performance. [Exhibit 1]. At the age of 13, his reading skills were at a third grade level and at a fourth grade level for math. His 9th grade GPA was 1.0 and he was well behind in progressing to a timely graduation. Id.

The report concludes with this summary:

"He is not doing well in 4 of his 6 classes. Teachers report he is just not motivated to do any work. At the start of the year he was having trouble with attendance, but it is better now. Team had a long talk about getting his grades up to avoid losing his credits, we also talked about after-school tutoring on Tues, Weds, and Thurs. The team decided to place Ruben in an all instructional level academics for 2008-09 school year." Id.

Leila Moreno attended the conference with the defendant and she did her best to encourage the defendant to continue to pursue his education and take advantage of the programs and assistance the school district was offering. Ruben Sr. did not attend the conference but instead ridiculed the defendant, mocked his lack of academic achievement, and told the defendant that he was wasting his time in continuing his education.

For the defendant this episode was his breaking point. The defendant's academic progress lagged as early as kindergarten, which he repeated before attending first grade. By second grade the defendant required significant one to one attention from his teacher and the teacher's aide. At this early age it was noted that he had difficulty remembering things he previously learned, and he had a short attention span, he worked very slowly, and he had difficulty following instructions. [Exhibit 2]. The defendant's overall cognitive ability was measured in the low average compared to age peers at the age of 7. The defendant's math skills were at the pre-kindergarten level. Id.

The years of academic failure, combined with the verbal abuse and ridicule from Ruben Sr. resulted in the defendant's choice to abandon school and stop pursuing his education. Now out on the streets full time at 16 years of age the defendant joined his gang around his 18th birthday. Having already wasted two years of his life living everywhere but at his parent's home, the defendant sought refuge through gang membership, believing that this was a group that would embrace him and accept him. The defendant willingly joined the gang as a foot soldier. The defendant spent the next six years of his life, up until his arrest in July 2016, as a member of the gang.

The defendant's first reported arrest came shortly after joining the gang (September 2010, possession of cannabis). The defendant had 11 misdemeanor arrests between 2010 and July 2016. Exclusive of this offense, the defendant's only conviction is the 2011 Criminal Trespass to Land case, a Class A misdemeanor, for which the defendant received a sentence of 18 months supervision. The prior criminal history of the defendant indicates that this criminal behavior was induced by his gang membership and the orders received from gang leaders. The defendant's incarceration in this matter represent his only significant custodial period.

The defendant enjoyed a close relationship with his mother and sister prior to his gang membership. The defendant has repaired all of his family relationships since his incarceration including his relationship with his father, Ruben Sr. The defendant will have the support of his family and expects to reside with his parents upon the completion of this sentence. The defendant's parents Leila and Reuben Sr. are preparing to provide emotional and financial support to the defendant upon his release from custody. Leila and Ruben Sr. intend to assist the defendant with vocational training and improving his reading skills to better prepare him for stable, meaningful employment.

The defendant does not have any diagnosed mental health conditions but he has suffered from bouts of depression while in custody. The defendant advised the probation officer that while in custody in 2017 he considered suicide because of the stress of the case. The defendant would likely benefit from mental health counseling.

The defendant has abused alcohol since the age of 15, until his arrest. The defendant is concerned about his alcohol use, as his father has a history of alcohol abuse. The defendant has been a frequent user of marijuana, cocaine, and Xanax. The defendant has experimented with ecstasy in the past. Given the defendant's young age when this drug use first began (15 years old) and the frequency of the usage, a drug rehabilitation program would be beneficial to the defendant's future sobriety.

The defendant's academic struggles are detailed above. Presently, the defendant lacks the basic reading, writing, and math skills to have a reasonable opportunity to secure meaningful long term employment. The defendant's parents will help him pursue programs in this area. The defendant needs extensive assistance to develop these basic skills, which will help him secure employment in the future. At an early age the defendant expressed a desire to be an automobile mechanic, a career that he still desires to pursue. As reading skills are absolutely essential to any real employment opportunity. Allowing the defendant to participate in educational programs while in custody will further his rehabilitation.

The defendant's employment has been sparse, mostly working manual labor jobs. The defendant is physically and mentally fit to be employed, but he will need an educational foundation before he can pursue vocational training, which he desires.

### IV. Sufficient Sentence for this Defendant

The sentencing guidelines have been made advisory and are no longer mandatory under the decision in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). Booker requires the sentencing judge to begin the sentencing process by determining the applicable guideline range, but permits the judge, so long as he does not stray outside the statutory range, to sentence the defendant below or above the guideline range if the sentencing factors in the Sentencing Reform Act, 18 U.S.C. § 3553(a) warrant it. United States v. Roberson, 474 F. 3d 432 (7th Cir. 2007). The defendant acknowledges that the advisory guideline sentence is the presumptively reasonable sentence. United States v. Mykytiuk, 415 F. 3d 606 (7th Cir. 2005). However, the court should not presume that it is the correct sentence. Unites States v. Brown, 450 F. 3d 76 (1st Cir. 2006).

As a result of Booker and its progeny, it is now well settled that the sentencing courts are expected to treat the sentencing guideline as advisory, viewing them as but one factor to consider in fashioning a sentence that meets the statutory goals set forth by Congress in

18 U.S.C.§3553(a). Thus, this court is no longer bound solely by the guidelines but must consider the factors outlined in §3553(a). As long as this court considers all of the factors of §3553(a), its' "freedom to impose a reasonable sentence outside the range is unfettered." United States v. Demaree, 459 F. 3d 791, 794 (7th Cir. 2006). Pursuant to 18 U.S.C. §3553(a) the court must impose a sentence sufficient but not greater than necessary after considering the factors listed in §3553(a). These factors include: the nature of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and sentencing range established by the sentencing guidelines.

In Rita v. United States, 551 U.S. 338, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007) the court confirmed that as to the sentencing court the guideline range is simply one of several factors listed on 18 U.S.C. §3553 that must be considered in arriving at a just sentence, a sentence that is sufficient, but not greater than necessary, to meet the traditional purposes of criminal sentence. The District Court's job is not to impose a "reasonable" sentence but instead to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of section §3553(a)(2). United States v. Foreman, 456 F. 3d 638 (6th Cir. 2006). This language, also referred to as the "parsimony provision" of §3553(a), has become the "guidepost" for sentencing decision post-Booker. United States v. Ferguson, 456 F. 3d 660 (6th Cir. 2006).

A sentencing judge must make an independent determination of what sentence is sufficient, but not greater than necessary, to comply with the purposes of §3553(a) taking into account the advisory guideline range, the relevant §3553(a) factors, and any other non-frivolous arguments presented in support of a particular sentence. United States v. Wilms, 495 F.3d 277 (6th Cir. 2007).

Several Federal Courts have recognized that, under some appropriate instances, a shorter term of incarceration may be sufficient to deter an offender who has not previously experience the deterrent effects of incarceration. United States v. Mishoe, 241 F. 3d 214, 220 (2nd Cir.

2001), United States v. Lewis, 459 Fed. Appx. 742 (10th 2012), United States v. Santoya, 493 F. Supp. 2d 1075, 1081 (E.D. Wisc. 2007). "A major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses. If, for example, a defendant twice served [lengthy prison sentences] and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial… conversely, if a defendant served no time or only a few months for the prior offenses, [then a shorter sentence] for the current offense might be expected to have the requisite deterrent effect." Mishoe at 220. "Generally a lesser period of incarceration is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to reoffend". Santoyo at 1081.

## V.     Reasonable Sentence for this Defendant.

An analysis of the appropriate factors to be considered in determining a sufficient sentence for Ruben Moreno leads to the conclusion that a sentence below the low end of the guideline range is appropriate. Pursuant to 18 U.S.C §3553(a), the Court must impose a sentence which is sufficient but not greater than necessary after considering the factors listed in §3553(a). the factor include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offence and promote respect for the law; (3) to afford adequate deterrence to criminal conduct; (4) to protect the public from further crimes of the defendant, and (5) the sentence must take into account the kinds of sentence and the sentencing range established for the offense.

The grave emotional toll for Mr. Moreno caused by his incarceration and separation from his family will be sufficient to deter him from committing any further crimes in the future. The defendant is heartbroken that his own poor judgment has caused this lengthy separation from his young son. The defendant fully understands that he deserves a lengthy custodial sentence for his terrible decisions, but he is hopeful that he can be allowed the best possible opportunity to begin rebuilding his life again when he is released. He is especially hopeful that he can be released when there is still time to provide parental guidance to his son during the formative years of his youth and young adulthood. The defendant is determined to become a better role model and father figure for his son in the future. He hopes that this parental guidance can help his son avoid making the same mistakes that his father has made being straying into a criminal lifestyle.

Since his arrest the defendant has exhibited respect for the law through his acceptance of responsibility for his actions by pleading guilty. Any significant term of incarceration will have a meaningful tendency to discourage the defendant from recidivism and thoroughly impress upon him that any further criminal activity would result in severe consequences.

The public will be adequately protected from further crimes by this defendant due to his incarceration, which will be followed by a period of supervised release. Thankfully the defendant will enjoy the love and support of his family whenever he is ultimately released from custody. This support structure will be helpful when Mr. Moreno works to reintegrate himself back into legitimate society. Mr. Moreno has no prior experience with incarceration in a prison system, therefore a far shorter term of imprisonment would likely suffice to accomplish the same deterrent effect. Under these circumstances a shorter prison term, below the low end of the applicable guideline range, will suffice to serve the goals of deterrence.

Mr. Moreno was only a teenager when he became involved in the Latin Kings gang and he was still a very young man when he committed the worst conduct for which he is currently being held accountable. The defendant was much younger than some of his codefendants when he committed his crimes, and, unlike Mr. Moreno, many of them were seasoned criminals with a history of recidivism after repeated episodes of incarceration.

It is not unreasonable for a sentencing court to consider youth and immaturity as a mitigating factor at sentencing. Gall v. United States, 552 U.S. 38, 58, 128 S. Ct. 586, 601, 169 L. Ed. 2d 445, 462 (2007). "Youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S. Ct. 869, 877, 71 L. Ed. 2d 1, 11 (1982). "A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." Johnson v. Texas, 509 U.S. 350, 367, 113 S. Ct. 2658, 2668-2669, 125 L. Ed. 2d 290, 306, (1993); Roper v. Simmons, 543 U.S. 551, 569, 125 S. Ct. 1183, 1195, 161 L. Ed. 2d 1, 21 (2005).

The defendant's lack of maturity and underdeveloped sense of responsibility is evident, starting with his decision to leave his parent's home at the age of 16 without a plan in-place for steady housing. "Crashing" with friends in an unstructured setting lured the defendant into the weak decision to join the gang. The defendant engaged in criminal conduct only after joining the gang, the defendant's first arrest, at the age of 18, involved gang activity at the direction of a gang leader, specifically "tagging" gang symbols on a wall. The influence of the gangs elders, combined with the defendant's lack of mature decision-making ability allowed him to seek deeper and deeper in the gang culture.

The defendant was also extraordinarily vulnerable to negative peer-pressure because of his severe academic difficulties and his unsupportive home life. The defendant did not have access to the positive outlets that are traditionally available to youth. He struggled academically because of virtually insurmountable learning difficulties that developed in his early childhood. Instead of receiving positive encouragement from his father in addressing these learning issues, he was instead subjected to ridicule and derision. Even if the defendant's father had the best of intentions in attempting to motivate his son to do better in school, this parenting style proved to be deeply traumatic to Mr. Moreno and it caused irreparable damage to his academic life. Without any meaningful avenue of academic success available him, Mr. Moreno was deprived of this important positive influence in his life, and, as a result, he became especially susceptible to the misguided social and emotional appeal of gang life, where he found an initial sense of approval and validation that he did not receive at home or at school.

Regardless of the exact length of the sentence that is ultimately imposed, Mr. Moreno will be an older and more mature person when he is eventually released from custody. It is often true that young people are capable of committing terrible acts of criminal behavior that they would not have otherwise committed if they were older. As an older person Mr. Moreno will be much better equipped to resist the negative influences which led him astray in his late teens and his early 20's. With the wisdom that comes with age and maturity, Mr. Moreno will be better at avoiding these negative influences altogether, and he will also be better at resisting them if he faces these issues again. He will have the lasting memory of his lengthy incarceration to deter him from any future recidivism, and he will also have the incentive of his familial duties and responsibilities that will motivate him to live a healthy, law-abiding, and productive life. Under these circumstances Mr. Moreno does not present a particularly likely risk of reoffending again in the future.

### VI. <u>**Conditions of Supervised Release.**</u>

Counsel has reviewed the supervised release conditions with the defendant. The defendant has no objection to the stated conditions of release.

        Respectfully Submitted,

        <u>s/Robert L. Rascia/August 21, 2020</u>
        **ROBERT L. RASCIA, ARDC No. 6184470**
        Attorney for the Defendant

        The Law Offices of
        Robert Louis Rascia, Ltd
        650 N. Dearborn/Suite 700
        Chicago, IL 60654
        312-994-9100 Office
        312-994-9105 Fax
        <u>rrascia@rasciadefense.com</u>; Email

-15-

## **CERTIFICATE OF SERVICE**

      I, ROBERT L. RASCIA, deposes and states that I have served a copy of Defendant's Sentencing Position Paper VIA ELECTRONICALLY FILING to Assistant United States Attorney Matthew Hernandez on this 21st day of August, 2020.

                              s/Robert L. Rascia/August 21, 2020
                              **ROBERT L. RASCIA, ARDC No. 6184470**
                              Attorney for the Defendant

                              The Law Offices of
                              Robert Louis Rascia, Ltd
                              650 N. Dearborn/Suite 700
                              Chicago, IL 60654
                              312-994-9100 Office
                              312-994-9105 Fax
                              rrascia@rasciadefense.com; Email